IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT
NORTHERN DISTRICT OF TEXAS
FILED
NOV - 1 2017
CLERK, U.S. DISTRICT COURT
By_____
          Deputy

| | | |
|---|---|---|
| LYNN WAYNE WOOLEY, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-01162-A |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISIONER OF | § | |
| SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation

of the United States Magistrate are as follows:

### FINDINGS AND CONCLUSIONS

### I.    STATEMENT OF THE CASE

Plaintiff Lynn Wooley ("Wooley") filed this action pursuant to section 405(g) and

1383(c) of Title 42 of the United States Code for judicial review of the Commissioner of Social

Security's final decision denying his claims for supplemental security income ("SSI") under Title

XVI of the Social Security Act ("SSA"). In August 2012, Wooley filed an application for SSI,

alleging his disability began on August 6, 2012. (Transcript ("Tr.") 12, 321-27.) After his

application for SSI was denied both initially and on reconsideration, Wooley requested a hearing

before an Administrative Law Judge ("ALJ"). (Tr. 210-14, 221-25.) The ALJ held a hearing on

February 28, 2014, and he issued a fully favorable decision on June 12, 2014. (Tr. 12, 33-73,

191-202.)  In his June 12, 2014 decision, the ALJ performed the five-step sequential evaluation process for determining whether a person is disabled and concluded, *inter alia*, that Wooley was disabled as there were no jobs that existed in significant numbers in the national economy that Wooley could perform.  (Tr. 195-202.)

On August 6, 2014, the Appeals Council, exercising its own motion authority, vacated the ALJ's decision and remanded the case to the ALJ for further proceedings.  (Tr. 12, 272-77.) The ALJ held a remand hearing on November 30, 2015, and issued an unfavorable decision on April 29, 2016.  (Tr. 12-25, 99-151.)  After the Appeals Council denied Wooley's request for review on November 3, 2016, he subsequently filed this civil action seeking review of the ALJ's decision.  (Tr. 1-4.)

## II.    STANDARD OF REVIEW

SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, and numerous regulatory provisions.  *See* 20 C.F.R. Pt. 416 (SSI).  The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity."  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 416.920.

First, the claimant must not be presently working at any substantial gainful activity.  20 C.F.R. § 416.920(b).  "Substantial gainful activity" is defined as work activity involving the use of significant physical or mental abilities for pay or profit. *See* 20 C.F.R. § 416.972.  Second, the claimant must have an impairment or combination of impairments that is severe.  20 C.F.R. § 416.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v.*

2

*Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing. 20 C.F.R. Pt. 404 Subpt. P, App. 1. 20 C.F.R. § 416.920(d). Fourth, if disability cannot be found based on the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to her past relevant work. *Id.* § 416.920(f). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experiences. *Id.* § 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Circ. 1999).[1] At steps one through four, the burden of proof rests upon the claimant to show she is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of her existing impairments. *Id.* If the Commissioner meets his burden, it is up to the claimant to then show that she cannot perform the alternate work. *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards, and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence supports the conclusion that was reached by the ALJ. *Dollis v. Astrue*, No. 4:08-CV-00503-A, 2009 WL 1542466, at *5 (N.D. Tex. Jun. 2, 2009). Substantial evidence

---

[1] Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity to determine the most the claimant can still do notwithstanding her physical and mental limitations. 20 C.F.R. § 416.920(a)(4). The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* § 416.920(a)(4). At step four, the claimant's RFC is used to determine if the claimant can still do her past relevant work. *Id.* § 416.920(a)(4)(iv). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* § 416.920(a)(4)(v).

is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III.    ISSUES

In his brief, Wooley presents the following issues:

1. Whether the ALJ's residual functional capacity determination ("RFC") is supported by substantial evidence as the ALJ failed to include any limitations regarding Wooley's need for a cane to ambulate;

2. Whether the ALJ properly evaluated the opinion of the medical expert, Kweli Amusa, M.D. ("Dr. Amusa");

3. Whether the ALJ erred by discounting the opinion of the SSA's examining psychologist, Deborah Gleaves, Ph.D. ("Dr. Gleaves"); and

4. Whether the ALJ's findings at Step Four are supported by substantial evidence and whether the ALJ erred by failing to resolve inconsistencies in his alternate findings at Step Five.

(Plaintiff's Brief ("Pl.'s Br.") at 1.)

## IV.    ALJ DECISION

In his April 29, 2016 decision, the ALJ concluded that Wooley was not disabled within the meaning of the SSA. (Tr. 25.) In making his determination, the ALJ proceeded to follow the five-step sequential evaluation process set forth above. (Tr. 12-25.) At Step One, while the ALJ found that Wooley had engaged in substantial gainful activity from August 2012 to December 2013, he found a 12-month period during which Wooley had not engaged in any substantial

4

gainful activity from January 1, 2014 to the date of the ALJ's decision. (Tr. 15.) At Step Two, the ALJ further held that Wooley suffered from the following severe impairments: (1) degenerative disc disease of the lumbar spine; (2) degenerative joint disease and tear of the left shoulder; (3) chronic obstructive pulmonary disease with a history of smoking; (4) obstructive sleep apnea; (5) obesity; (6) depression; (7) schizoaffective disorder; and (8) borderline intellectual functioning. (Tr. 15.) At Step Three, the ALJ found that none of Wooley's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 16-19.) As to Wooley's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can stand and walk two to four hours in an eight-hour day, sit six hours, and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant could never climb ladders, ropes, or scaffolds, and would need to avoid moderate exposure to temperature extremes, respiratory irritants, vibrations, and uneven ground surfaces. The claimant would need to alternate between sitting and standing every hour for a few minutes. The claimant could occasionally reach overhead and could push and pull frequently but not constantly. The claimant could perform simple job tasks (defined as routine, repetitive tasks with little variation in duty and involving simple judgment-making) and engage in superficial public contact.

(Tr. 19 (emphasis omitted).)

The ALJ found, at Step Four, that Wooley was able to perform his past relevant work as a restroom attendant because it does not require him to perform any of the work-related activities precluded by his RFC. (Tr. 23.) Although he found that Wooley was not disabled at Step Four, the ALJ proceeded to Step Five, where he made alternative findings based on the testimony of the vocational expert ("VE"). (Tr. 23-24.) There, he concluded that Wooley could perform other work that existed in significant numbers in the national economy. (Tr. 23-24.) Accordingly, the ALJ found that Wooley was not disabled. (Tr. 25.)

5

# V.    DISCUSSION[2]

## A.  RFC Determination and Use of Cane

In his brief, Wooley argues that the ALJ's RFC determination is not supported by substantial evidence because, while the ALJ did not contest his need to use a cane, the ALJ failed to include this limitation in the RFC without any explanation.  (Pl.'s Br. at 11.)  Further, Wooley argues that the ALJ's failure is not a harmless error because, without considering his cane as an additional limitation and "the additional reaching, handling, and fingering limitations associated with Wooley's need to grasp a cane while performing work-related activities, the RFC overestimates his capabilities.  (Pl.'s Br. at 12-13.)  Wooley argues that "it is unambiguous Agency policy that a claimant who only has one hand available with which to lift and carry objects while standing/walking (like, for instance, someone who was carrying a cane) would face significant work-related limitations in the performance of light work, as that term is described in the regulations.  (Pl.'s Br. at 13.)

RFC is what an individual can still do despite his limitations.[3]  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  *Id.*; *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule.  SSR 96-8p, 1996 WL 374184, at *2.  RFC is not the least an individual can do but the most.  *Id.*

---

[2] The Court notes that several of the regulations and applicable SSRs governing social security cases were recently amended or rescinded. *See, e.g.*, 82 Fed. Reg. 5844-01, 2017 WL 168819 (F.R. Jan. 18, 2017).  These new rules generally apply to claims filed on or after March 27, 2017 and so are not applicable to this case. *Id.*  Thus, any cites (unless otherwise noted) will be to the old rules that are applicable to claims, such as this one, that were filed prior to March 27, 2017.

[3] The Commissioner's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005).  The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

The RFC is a function-by-function assessment, with both exertional and nonexertional[4] factors to be considered, and is based upon all of the relevant evidence in the case record. *Id.* at 3-6. The responsibility for determining a claimant's RFC lies with the ALJ,[5] and is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("[T]he ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is the most supported by the record."). The ALJ must discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and resolve any inconsistencies in the evidence.[6] SSR 96-8p, 1996 WL 374184, at *7.

In making an RFC assessment, an ALJ is to consider all medical opinions in determining the disability status of a claimant. 20 C.F.R. § 416.927(b). The ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence. *See* 20 C.F.R. § 416.929; SSR 16-3P, 2016 WL 1119029, at *2 (Mar. 16, 2016); SSR 96-8p, 1996 WL 374184, at *5. The ALJ must also consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *Id.* Additionally, the ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security ruling also cautions that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), superseded by SSR 91-7C, 1991 WL 231791, at *1 (S.S.A.

---

[4] Exertional capacity addresses an individual's ability "to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." SSR 96-8p, 1996 WL 374184, at *5. Each function must be considered separately, but the final RFC assessment may combine activities. *Id.* Nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength," including mental limitations. *Id.* at *6.

[5] *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990).

[6] The ALJ is not required to discuss each written detail of his examination in the process of determining a claimant's RFC. *Black v. Colvin*, No. 2:12-CV-0233, 2014 WL 1116682, at *4 (N.D. Tex. Mar. 20, 2014).

Aug. 1, 1991) (only to the extent that the SSR discusses the former procedures used to determine disability in children).

In this case, as stated above, the ALJ found that Wooley had the RFC to perform light work except with the following limitations: (1) can stand and walk two to four hours in an eight-hour day; (2) sit six hours; (3) occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, and stairs; (4) never climb ladders, ropes, or scaffolds; (5) avoid moderate exposure to temperature extremes, respiratory irritants, vibrations, and uneven grounds surfaces; (6) alternate between sitting and standing every hour for a few minutes; (7) occasionally reach overhead and could push and pull frequently but not constantly; (8) perform simple job tasks, defined as routine, repetitive tasks with little variation in duty and involving simple judgment-making; and (9) engage in superficial public contact.  (Tr. 19.)  Contrary to Wooley's claims, the ALJ considered his need to ambulate with a cane as he specifically mentioned in his decision that the "medical expert testified that medical records showed the claimant ambulated with a cane."  (Tr. 20; *see* Tr. 117-18.)  In addition, the ALJ, *inter alia*, stated:

> In sum, the above residual functional capacity assessment is supported by medical expert testimony as well as claimant testimony and a longitudinal history of medical evidence.  With regard to his physical impairments, the records supports a finding that the claimant is able to perform a less than full range of light work because despite back and shoulder pain with obesity, the claimant was able to ambulate, **albeit with a cane at times**, perform light household chores, leave his home to socialize and run errands, and was able to operate a motor vehicle during the timeframe relevant to the application.  Additionally, medical evidence showed that the claimant's pain was treated with medication and injections, which controlled symptoms well.  Despite the claimant's testimony that he required [an] oxygen [tank] 24 hours per day, this was not consistent with medical evidence or medical expert testimony.  Furthermore, the residual functional capacity takes into consideration the claimant's assertions that he required breaks to sit and stand throughout the day.

(Tr. 23 (emphasis added).)  The ALJ also stated that "the extent of the claimant's mobility and the limitations caused by his back and shoulder pain are inconsistent throughout the record."

8

(Tr. 21.) Based on the foregoing, it is clear that the ALJ considered Wooley's use of a cane in formulating the RFC even though the extent of his mobility issues was inconsistent throughout the record.

Moreover, the majority of Wooley's arguments regarding this issue are based on the premise that the ALJ found that Wooley had the RFC to perform "light work." However, as indicated above, the ALJ found that Wooley could perform light work with eight additional restrictions, including restrictions relating to Wooley's inability to ambulate without a cane at all times. While Wooley argues that the cane imposes an additional limitation on his ability to work not included in the RFC (Pl.'s Br. at 12-13), nothing in the medical evidence supports his assertion. (Tr. 20.) The ALJ, as the Court noted above, is not required to incorporate limitations into his RFC assessment that are not supported by the record, and he alone has the responsibility to determine which limitations are sufficiently supported. *Muse*, 925 F.2d at 790. Because the ALJ specifically considered Wooley's use of a cane and incorporated appropriate limitations into the RFC based on the evidence in the record regarding Wooley's ability to ambulate, the ALJ did not err and remand is not required.

### B. Medical Opinions of Medical Expert Dr. Amusa

In his brief, Wooley argues that the ALJ improperly weighed the expert medical opinion of Dr. Amusa, who testified at the November 30, 2015 hearing before the ALJ, because the ALJ failed to explain what weight, if any at all, he assigned to her medical opinion. (Pl.'s Br. at 14-15.) Wooley claims that this error is harmful "as Dr. Amusa's opinion establishes greater exertional limitations than found by the ALJ." (Pl.'s Br. at 15.)

In considering Wooley's functional limitations, Dr. Amusa, *inter alia*, stated:

I think over this time period, from August of 2012 to present, the limitations would change. So in the beginning, August 2012, the claimant would be limited

9

to no lifting or carrying greater than 20 pounds occasionally or 10 pounds frequently. He would stand or walk six hours in an eight-hour day and sit for six. He would never climb ladders, ropes, or scaffolds, and all other postural would be performed occasionally. The other limitations would be environmental. The claimant would tolerate only moderate exposure to temperature extremes, and as well as to any respiratory irritants. And with regards to the lumbar disc disease, he would only tolerate moderate exposure to vibration, or uneven ground or surfaces. He—I think the limitations would be further reduced starting in May of 2014 where the standing and walking would be limited to the [sic] four hours in an eight-hour day. And so that would be the additional limitation starting in May of 2014. I will add, judge, with regard to the problem with the shoulders, I did not include that and the tibial impairment simply because this is not a condition that I've seen for 12 months or greater.

(Tr. 118-19.) The ALJ then asked Dr. Amusa whether, at least since April 2015, additional restrictions would be imposed on Wooley if these shoulder and tibial impairments been considered. (Tr. 119.) In response, Dr. Amusa stated:

Oh, absolutely. So it is clear that he has a decreased range of motion in his shoulders due to the pain in the degenerative disc disease, and the partial tears. So he would be limited as of April 2015 to reaching overhead just occasionally. There may be also indication for reducing the lifting and carrying, further reduction in the weight [INAUDIBLE] as well as pushing and pulling with the upper extremities to frequently.

(Tr. 119). When further questioned, Dr. Amusa indicated that with the reduction in weight, Wooley would be able to perform only sedentary work as of April 2015, but that she did not believe such condition would last for a full twelve months. (Tr. 119-20.) In addition, Dr. Amusa indicated that Wooley would require a brief break to stand and stretch every one to one and a half hours in between any type of prolonged sitting. (Tr. 122-24.)

Pursuant to 20 C.F.R. § 416.927(b), an ALJ is to consider all medical opinions in determining the disability status of a claimant. However, an ALJ is not required to give controlling weight to medical opinions of non-treating sources. *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 637 (N.D. Tex. 2013) (stating that an ALJ is not required to give the opinion of, *inter alia*, a consultative examiner controlling weight).

10

Contrary to Wooley's claims, the Court finds that the ALJ did properly consider Dr. Amusa's opinions in his decision. (Tr. 20, 23.) To begin with, while the ALJ did not specifically state the exact weight he gave to Dr. Amusa's medical findings, it is clear that the ALJ gave great weight to the majority of Dr. Amusa's opinions as most of her opinions are included in the ALJ's RFC determination[7] and applied Dr. Amusa's opinions throughout Wooley's credibility determination regarding mobile oxygen.[8] (Tr. 21.) As to those opinions of Dr. Amusa that the ALJ did not adopt, such as Dr. Amusa's findings regarding Wooley's shoulder impairments and restrictions, the ALJ explained that he found the limitations caused by Wooley's back and shoulder pain to be "inconsistent throughout the record" because, "despite back and shoulder pain with obesity, [Wooley] was able to ambulate, albeit with a cane at times, perform light household chores, leave his home to socialize and run errands, and was able to operate a motor vehicle during the timeframe relevant to the application." (Tr. 21, 23.) Rather than fully rejecting Dr. Amusa's medical opinion regarding, *inter alia*, Wooley's shoulder pain, as Wooley argues, the ALJ chose to not adopt those portions of Dr. Amusa's findings that the ALJ found were inconsistent with the other medical evidence in the record. (Tr. 21, 23.) In

---

[7] Dr. Amusa testified that, as of May 2014, Wooley, *inter alia*, could: (1) lift no more than ten pounds frequently and twenty pounds occasionally; (2) stand and walk for no more than two to four hours; (3) sit six hours; (4) not climb ladders, ropes, or scaffolding but occasionally perform the other postural activities; (5) tolerate up to moderate exposure to temperature extremes, respiratory irritants, vibrations, and uneven floor or ground surfaces; and (6) need to stand up and stretch for one to two minutes every one to one-and-a-half hours. (Tr. 21, 114-24.) The ALJ found, based on Dr. Amusa's testimony, as well as other evidence in the record, that Wooley had the RFC to: (1) perform light work (with certain limitations), which is defined in 20 C.F.R. 416.967(b) as, *inter alia*, "lifting no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up to 10 pounds;" (2) stand and walk two to four hours; (3) sit six hours; (4) never climb ladders, ropes, or scaffolds but occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; (5) avoid moderate exposure to temperature extremes, respiratory irritants, vibrations, and uneven ground surfaces; (6) need to alternate between sitting and standing every hour for a few minutes; (7) occasionally reach overhead and push and pull frequently but not constantly; (8) perform simple job tasks; and (9) engage in superficial public contact. (Tr. 19.)

[8] The ALJ found that Wooley's "veracity regarding his oxygen use for COPD and shortness of breath was inconsistent throughout the record. [Wooley] appeared at the hearing with an oxygen tank and testified that he required it 24 hours per day, when both sleeping and mobile, for the last two months, but this was inconsistent with the doctor's prescription in file." (Tr. 21.) The ALJ specifically noted that Dr. Amusa testified that Wooley required oxygen at night, and did not require it for mobility. (Tr. 20; *see* Tr. 116.)

11

addition, while the ALJ may not have agreed with Dr. Amusa that after April 2015 Wooley's shoulder pain prevented him from performing "light work," the ALJ considered such pain and included appropriate limitations in the RFC determination regarding Wooley's ability to perform overhead reaching, lifting, and carrying. (Tr. 19, 119.) Because the ALJ properly considered Dr. Amusa's opinions in his RFC determination and such RFC determination is supported by substantial evidence, the Court concludes that the ALJ did not err and remand is not required.[9]

### C. <u>Medical Opinions of Examining Psychologist Dr. Gleaves</u>

Furthermore, Wooley argues that the ALJ failed to properly evaluate the opinion of Dr. Gleaves, an examining consultant. Specifically, Wooley argues that the ALJ erred by: (1) failing to properly apply the factors set forth in 20 C.F.R. § 416.927(c) and explaining his decision to afford Dr. Gleaves' medical opinions "less than great weight;" (2) misconstruing Dr. Gleaves' opinion concerning the validity of Wooley's test results; (3) rejecting specific findings made by Dr. Gleaves without giving any explanation for doing so; (4) failing to fully and fairly develop the record with regards to Dr. Gleaves' opinions; and (5) failing to properly consider the opinions of the state agency medical consultants ("SAMCs"). (Pl.'s Br. at 17-19.)

In evaluating Dr. Gleaves' medical opinions, the ALJ, *inter alia*, stated:

> The claimant was prescribed medication and acknowledged that it helped with symptoms including decreasing voices, depression, and agitation, as well as improving sleep. (B17/F3 [Dr. Gleaves' Consultation Examination Report dated June 2015].) The claimant was administered the Weshcler [sic] Adult Intelligence Scale, 4th Edition in June 2015, but was minimally involved with the assessment procedures and therefore, Deborah Gleaves, Ph.D., reported that the results may

---

[9] While the ALJ may have erred in not setting forth the weight she was giving to Dr. Amusa's opinions, any error in this regard is harmless as it is obvious from a reading of the ALJ's decision that the ALJ properly considered Dr. Amusa's opinions. *See, e.g., Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required."); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *McNeal v. Colvin*, No. 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's improper evaluation of opinion of treating physician); *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (in the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error).

underestimate his actual functional functioning: verbal comprehension 56, perceptual reasoning 56, working memory 53, processing speed 53, and full scale IQ 50 (B17F/6-7)[.]

. . . .

Following a consultative exam in June 2015, Deborah Whitehead Gleaves, Ph.D., opined that the claimant was able to understand, carry out, and remember one and two-step instructions but not complex instructions. She opined that the claimant had limited ability to sustain concentration and persist in related activity at a reasonable pace as well as limited interest in maintaining social interaction with supervisors, coworkers, and the public. Dr. Gleaves opined that the claimant was unable to deal with normal pressures in a competitive work setting. The undersigned affords this opinion some weight but notes that Dr. Gleaves was merely an examining source and not a treating source. Furthermore, while Dr. Gleaves performed intelligence testing on the claimant, she reported that the results might not be reliable. Lastly, her exam of the claimant was in June 2015, but the claimant's most recent testimony at the hearing, when considered with longitudinal medical evidence, showed that he was able to deal with the normal pressures of a competitive work setting so long as he worked in a simple and routine job setting with superficial public contact. For these reasons, the undersigned afforded this opinion some weight.

(Tr. 20-22 (internal citations omitted).)

As to Wooley's first argument,[10] the Court concludes that the ALJ properly considered the medical opinions of Dr. Gleaves. To begin with, as the ALJ noted, Wooley made only one visit to Dr. Gleaves for a consultative examination in June 2015 and never received continuing treatment from her. (Tr. 22.) Thus, Dr. Gleaves is classified as a non-treating source in the context of Wooley's appeal, and the ALJ was only required to consider Dr. Gleaves' opinion as medical evidence to be weighed.[11] *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 637 (N.D. Tex. 2013) (stating that the ALJ is not required to give the opinion of a consultative examiner

---

[10] The Court notes that, while Wooley claims that the ALJ failed to consider the factors set forth in 20 C.F.R. § 416.927(c), he did not provide the Court with any legal basis to support his assertion in light of the fact that Dr. Gleaves was not a treating physician but a consultative physician. (*See* Pl.'s Br. at 17-18.)

[11] "Nontreating source means a physician, psychologist, or other acceptable medical source who has examined [a claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]. The term includes an acceptable medical source who is a consultative examiner for [the Social Security Administration], when the consultative examiner is not [the claimant's] treating source." 20 C.F.R. § 416.902.

controlling weight). Accordingly, Dr. Gleaves' medical opinions do not have controlling weight over Wooley's case, and the ALJ had the authority to reject Dr. Gleaves' medical opinions insofar as there is contradictory evidence in the record.

Moreover, the ALJ specifically set forth the weight he gave Dr. Gleaves' opinions, as required by 20 C.F.R. § 416.927, as the ALJ specifically stated that he was only affording Dr. Gleaves' opinions "some weight" because he found they were inconsistent with Wooley's own testimony as well as the longitudinal medical evidence. (Tr. 22.) In addition, the ALJ was not required to apply the factors listed in 20 C.F.R. 416.927(c) prior to giving Dr. Gleaves' opinions very little weight because such requirement only applies to opinions of treating physicians and not consultative examiners such as Dr. Gleaves. *See Sanchez v. Berryhill,* No. M-16-030, 2017 WL 2117526, at *5 (S.D. Tex. Mar, 31, 2017) ("The ALJ was not required to perform a detailed analysis of the "*Newton* factors" before declining to adopt or give significant weight to Dr. De Ferreire's findings and opinions because she is not a treating physician, but rather, Dr. De Ferreire acted as a consultative examiner."); *Ruffins v. Collins*, No. 14-754-RLB, 2016 WL 617445, at *3 (M.D. La. Feb. 16, 2016) ("[T]he factors set forth in 20 C.F.R. [416.927(c)] are not applicable because Dr. Van Hook is not a treating physician.").

As to Wooley's second argument regarding Dr. Gleaves' test results, the Court disagrees with Wooley's argument that the ALJ misconstrued Dr. Gleaves' opinion concerning the validity of the test results. (Tr. 20.) Specifically, the ALJ noted that, as to Wooley's test results, Dr. Gleaves "reported that the results may underestimate his actual intellectual functioning" before evaluating her medical opinion. (Tr. 20.) The Court is unclear what Wooley believes that ALJ has misconstrued as Dr. Gleaves, in her actual report, noted that Wooley's testing results were likely lower than they really were due to his minimal effort, depressed mood, and ongoing

psychotic process." (Tr. 1176.) The ALJ clearly considered Dr. Gleaves' opinions in formulating the RFC determination and gave them only "some weight" due to Wooley's most recent testimony at the hearing before the ALJ and the "longitudinal medical evidence." (Tr. 22.)

As to Wooley's third argument, where he references specific findings he believes were ignored by the ALJ, the Court concludes that the ALJ properly considered each finding in his RFC determination. To start, Wooley references Dr. Gleaves' opinion that he was "unable to deal with normal pressures in a competitive work setting," and argues that it is wholly inconsistent with the ALJ's conclusion that he could "cope with pressures and change in a routine work setting." (Pl.'s Br. at 19; Tr. 1177.) Wooley claims that such an inconsistency is reversible error because the ALJ failed to cite any medical evidence in the record to support such finding. (Pl.'s Br. 19.) The Court disagrees as, in his RFC determination, the ALJ explained that Dr. Gleaves' opinion was "inconsistent with [Wooley's] most recent testimony" and "longitudinal medical evidence" and opined that the recent medical evidence suggested that Wooley could handle such pressures as long as the job setting remained "simple" and "routine" with superficial contact with the public. (Tr. 22.) Such statement is supported by other evidence in the record, including the opinions of the SAMCs. (Tr. 21.)

Wooley also argues that the ALJ disregarded Dr. Gleaves' finding that Wooley could not "deal with people." (Pl.'s Br. at 19.) However, the ALJ incorporated this limitation, as Wooley's RFC determination limited him to "no more than superficial public contact." (Tr. 23.) Finally, Wooley claims that the ALJ failed to consider Dr. Gleaves' notes about Wooley's hallucinations and low IQ (Pl.'s Br. at 19.) In her opinion, Dr. Gleaves mentioned these conditions to support her conclusions regarding Wooley's ability to follow only simple, not

15

complex, work-related instructions. (Tr. 1179.) In addition, the ALJ noted that Wooley's mental health impairments were "controlled with medication." (Tr. 23.) In sum, contrary to Wooley's arguments, the Court concludes that the ALJ did not err by affording only "some weight" to Dr. Gleaves' opinion as he cited substantial medical evidence to support his decision. Thus, remand is not required.

As to Wooley's fourth argument, Wooley claims that the ALJ failed to perform his duty to develop the record because he did not ask Dr. Gleaves any further questions regarding her opinion. (Pl.'s Br. at 20.) In his brief, Wooley claims that the ALJ "could have obtained testimony from a psychological medical expert, arranged for an additional consultative examination or recontacted Dr. Gleaves for clarification, or sent the entire file back to the State Agency for review." (Pl.'s Br. at 20.) However, pursuant to 20 C.F.R. § 416.919p(b), the ALJ will recontact the consultative examiner if the report is inadequate or incomplete, which the ALJ did not find was an issue in this case. In addition, pursuant to 20 C.F.R. § 416.919a, the decision to recontact a treating physician, psychologist, or other medical source is discretionary. The regulation states that an ALJ *may* recontact the treating physician if the evidence is inconsistent or if the ALJ has insufficient evidence to determine whether the claimant is disabled. *See* 20 C.F.R. § 416.919a(a). In this case, the evidence was more than sufficient to allow the ALJ to make a proper assessment of Wooley's impairments and claim for disability.

As to Wooley's fifth argument, Wooley claims that the ALJ erred by assigning "great weight" to the opinions of the SAMCs when the SAMCS did not examine Wooley and did not consider over two years of medical records, including Dr. Gleaves' report. (Pl.'s Br. at 19.) As noted above, the ALJ is to consider all medical opinions in determining the disability status of a claimant. 20 C.F.R. § 416.927(b). Pursuant to SSR 96-6p, the ALJ and the Appeals Council are

not limited by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions. SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996).

Contrary to Wooley's claims, the ALJ carefully and individually considered each opinion and afforded "little weight" to the opinions that he believed "overestimated" Wooley's physical and mental abilities.[12] (Tr. 22.) In other words, the ALJ considered the SAMCs' findings in light of all of the evidence in the record, including Wooley's own testimony and the medical opinion of Dr. Gleaves, before he drafted an RFC determination that was best supported by the evidence as a whole. Moreover, the ALJ was careful to exclude any SAMCs' opinion that was later contradicted by other well-supported evidence in the record. (Tr. 21-22.) Specifically, the ALJ explained that he rejected certain findings made by the SAMCs because "evidence received after these sources issued their opinions showed that the claimant was not able to perform medium work." (Tr. 22.)

In sum, the Court finds that the ALJ adequately explained why he afforded less weight to certain medical opinion evidence. Although Wooley argues that the ALJ should have afforded Dr. Gleaves' opinion "great weight," as the Court noted above, the ALJ has the ultimate responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *See Muse*, 925 F.2d at 790. Because the Court finds that the ALJ properly considered both the opinions of Dr. Gleaves and the SAMCs in light of all of the evidence in the record, and substantial evidence supports the weight he afforded to each, remand is not required.

---

[12] The ALJ noted that the SAMCs' opinions did not consider Wooley's "subjective complaints of pain and shortness of breath," and were inconsistent with Wooley's "activities of daily [life]." (Tr. 22.)

## D. **Steps Four and Five Analysis**

As to the ALJ's findings at Steps Four and Five, Wooley argues that such findings are unsupported by the ALJ's own RFC determination. (Pl.'s Br. at 21.) Specifically Wooley claims that the ALJ erred at Step Four as a matter of law when he found that Wooley was capable of performing his past relevant work as a restroom attendant because the VE testified that Wooley could not perform this work if he was limited to two to four hours of standing, a limitation that was adopted by the ALJ in the RFC determination. (Pl.'s Br. at 21.) In addition, Wooley argues that the ALJ erred in classifying his past job as a restroom attendant as substantial gainful activity. (Pl.'s Br. at 22.) Assuming without deciding that the ALJ did err at Step Four in finding that Wooley could perform his past relevant, any error would be harmless because the ALJ also found, at Step Five, that there were other jobs that existed in significant numbers in the national economy that Wooley could perform as discussed below. (Tr. 23-24.)

As to Step Five, Wooley claims that the ALJ erred because he failed to identify and resolve conflicts between the VE's testimony regarding jobs that Wooley could perform and the job descriptions for such jobs contained in the Dictionary of Occupational Titles ("DOT") or its supplement, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"). (Pl.'s Br. at 23.) In support of this argument, Wooley states:

> Again, the Agency takes administrative notice of job information found in the DOT and the SCO. Before an ALJ may properly rely on the testimony of a vocational expert or resource to support a disability determination at step 5 of the sequential evaluation described in the Act and regulations, SSR 00-4p also requires that the ALJ identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by the vocational expert and the DOT/SCO and explain in the determination or decision how any conflict that has been identified was resolved.

> The ALJ's RFC and hypothetical question to the vocational expert limited Plaintiff to the performance of "light work" with occasional overhead reaching. In response, the vocational expert testified that a so-limited individual could

perform jobs as a small product assembler, DOT Code 706-684.22; small item
inspector, DOT Code 727.687.062; and laundry folder, DOT Code 369.687-018.
However, according to the SCO, these jobs entail *frequent* reaching. "Reaching"
is defined in the SCO as "[e]xtending hand(s) and arm(s) in any direction."

>    Since the jobs offered by the vocational expert ostensibly require frequent
>    overhead reaching, it is at best unclear if they can be performed under the ALJ's
>    hypothetical. As a result, this case must be remanded pursuant to SSR 00-4p for a
>    consideration of, and an explanation for, this conflict.

(Pl.'s Br. at 23-24 (internal citations omitted) (emphasis omitted) (footnote omitted).)

The Fifth Circuit has held that where there is a conflict between the VE's testimony and
the DOT/SCO, the ALJ may rely upon the VE's testimony, provided that the record reflects an
adequate basis for doing so. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). Because this
type of conflict surfaced somewhat frequently, the Commissioner issued SSR 00-4p to ensure
that ALJs would expose and reconcile such conflict before relying on VE testimony.[13] *Id.*; SSR
00-4P, 2000 WL 1898704 (Dec. 4, 2000). Specifically, the ruling unambiguously establishes the
ALJ's affirmative duty to bring to light and explain any possible conflict between the VE's
testimony and the DOT/SCO. When there is a conflict, neither the DOT/SCO, nor the VE
evidence automatically "trumps" the other. *Id.* The conflict must be resolved by determining
whether the VE's explanation is reasonable and provides a basis for relying on the VE testimony
rather than on the DOT/SCO information. *Id.* The ALJ must explain in his decision how any
conflict that has been identified was resolved. *Id.*

---

[13] Before SSR 00-04p became effective, the Fifth Circuit decided Carey to resolve whether VE testimony
that conflicts with the DOT can provide substantial evidence to support the Commissioner's decision. *Carey*, 230
F.3d 143-45 (identifying the various positions taken by other circuits); *see Johnson v. Astrue*, No. 11-3030, 2012
WL 5472418, at *8 (E.D. La. Oct. 5, 2005). The Fifth Circuit joined the majority of circuits in adopting a "middle
ground approach," under which "neither the DOT, nor the vocational expert testimony is per se controlling." *Carey*,
230 F.3d at 145-47. However, under this approach, the ALJ's "discretion to choose between conflicting evidence is
not unfettered" and in part depends on the nature of the conflict. *Romine v. Barnhart*, 454 F. Supp. 2d 623, 627
(E.D. Tex. 2006); *see Carey*, 230 F.3d at 146-47.

19

The *Carey* court identified three types[14] of conflict and limited its holding to "implied" or

"indirect" conflict, which is characterized as being tangential in nature and unapparent until

further inference is made. *Carey*, 230 F.3d at 145-47; *see Johnson*, 2012 WL 5472418, at *9 ("A

tangential, implied or indirect conflict occurs when there is no direct conflict between the expert

testimony regarding the exertional or skill level required for a particular job and the [DOT], but

additional inferences can be drawn (and the plaintiff is asking the court to draw them on appeal)

that the [DOT] description may conflict with the [VE's] testimony that the claimant is capable of

performing a particular job.")  In *Carey*, the claimant had only one arm, and the jobs in question

required manual dexterity. *Carey*, 230 F.3d at 146.  The court decided the conflict was implied

or indirect because it did not even become apparent until "further inference is made that the jobs

require manual dexterity with, not one, but two hands." *Id.*  The court held that, to the extent the

VE's testimony impliedly or indirectly conflicts with the DOT, "the ALJ may rely upon the

[VE]'s testimony provided that the record reflects an adequate basis for doing so." *Id.*  In so

holding, the court reasoned that a claimant who did not raise implied conflict at the

administrative hearing cannot be permitted to thereafter peruse the record in search of such

conflict to present as reversible error. *Id.* at 146-47.

Turning to Wooley's case, the Court notes that the ALJ did inquire and reconcile the only

direct conflict he found between the VE's testimony and the DOT, stating:

---

[14] Carey distinguished implied or indirect conflict from two other types of conflict: (1) the "direct and obvious" conflict, which exists when the VE's testimony conflicts with the DOT, and (2) the "less obvious" conflict, which arises when the VE's testimony "creates a conflict or discrepancy between the ALJ's [RFC] determination . . . and the DOT job descriptions." Id. at 145-46; *see Johnson*, 2012 WL 5472418, at *8 (stating that there are two ways VE's testimony can create a direct conflict: (1) when the VE testifies that a particular job requires a particular exertional or skill level when the DOT expressly provides that the job requires a different exertional level and (2) when the VE's testimony places the ALJ's RFC finding or the claimant's specific impairments in conflict with the exertional or skill level or specific skills required for the identified jobs in the DOT). Courts have continued to treat both the "direct and obvious" conflict and the "less obvious" conflict as "direct conflicts," a category of conflicts separate and distinct from the implied or indirect conflict. *See Graham v. Comm'r of Soc. Sec. Admin.*, No. 3:08-CV-2133-N (BH), 2009 WL 3199382, at *7 (N.D. Tex. Oct. 2, 2009); *Augustine v. Barnhart*, No. 1:00-CV-749, 2002 WL 31098512, at *9 (E.D. Tex. Aug. 27, 2002) (referring to obvious conflict and less obvious conflict as "direct conflict scenarios").

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational
> expert's testimony is generally consistent with the information contained in the
> [DOT].  With regard to the vocational expert's testimony on the sit-stand option,
> although this information is inconsistent with the DOT, the vocational expert was
> able to testify on these issues based upon her experience as a vocational expert.

(Tr. 24; *see* Tr. 144-146.)  However, in his brief, Wooley argues an additional direct conflict

between the VE's testimony and the SCO, and claims that the ALJ failed to properly consider it

under SSR 00-04p.  (Pl.'s Br. at 21-23.)  Wooley claims he could not have performed the jobs of

small item inspector,[15] small product assembler,[16] and laundry folder,[17] because each require the

---

[15] Small item inspector, which is listed in the DOT under section 727.687-062, is described as "[i]nspects finished or in-process dry cell or storage batteries for defects, such as dents, scratches, short electrodes, or missing parts: Examines batteries to detect defects and places defective batteries in box.  May test batteries, using voltmeters and ammeters.  May replace damaged parts."  DOT § 727.687-062 (rev. 4th ed. 1991).  It has a specific vocational preparation ("SVP") of two and is, thus considered an unskilled job.  *See* SSR 00-4p, 2000 WL 1898704, at *3 (stating that jobs having an SVP of one to two are defined as "unskilled work.")

[16] Small products assembler, which is listed in the DOT under section 706.684-022, is described as follows:

> Performs any combination of following repetitive tasks on assembly line to mass produce small
> products, such as ball bearings, automobile door locking units, speedometers, condensers,
> distributors, ignition coils, drafting table sub-assemblies, or carburetors: Positions parts in
> specified relationship to each other, using hands, tweezers, or tongs. Bolts, screws, clips, cements,
> or otherwise fastens parts together by hand or using hand tools or portable powered tools.
> Frequently works at bench as member of assembly group assembling one or two specific parts and
> passing unit to another worker.  Loads and unloads previously setup machines, such as arbor
> presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or
> broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line.
> May be assigned to different work stations as production needs require or shift from one station to
> another to reduce fatigue factor.  May be known according to product assembled.

DOT 706.684-022 (rev. 4th ed. 1991).  It has a specific vocational preparation ("SVP") of two and is, thus considered an unskilled job.  *See* SSR 00-4p, 2000 WL 1898704, at *3 (stating that jobs having an SVP of one to two are defined as "unskilled work.")

[17] Laundry folder, which is listed in the DOT under section 369.687-018, is described as follows:

> Folds fluff-dried or pressed laundry, such as shirts, towels, uniforms, and jackets: Shakes out,
> smooths, folds, sorts, and stacks wash according to identification tags.  Inspects pressed laundry
> for holes or tears, and separates defective articles for transfer to repair department.  Folds laundry,
> preparatory to wrapping, for delivery to customer.  Folds pressed shirts around cardboard forms
> and inserts assembly in plastic bags.  May attach missing buttons to articles, using button-sewing-
> machine or button-attaching machine.  May unload tumbler.  May turn socks, match pairs, and tie
> socks into bundles.  May be designated according to type of laundry folded as Shirt Folder
> (laundry & rel.) I; Wearing-Apparel Folder (laundry & rel.).

DOT 369.687-018 (rev. 4th ed. 1991).  It has a specific vocational preparation ("SVP") of two and is, thus, considered an unskilled job.  *See* SSR 00-4p, 2000 WL 1898704, at *3 (stating that jobs having an SVP of one to two are defined as "unskilled work.")

ability to reach frequently, and he is limited in the RFC determination to only occasional overhead reaching. (Pl.'s Br. at 21, 23.)

Contrary to Wooley's argument, however, Courts have repeatedly found that jobs requiring frequent reaching in general are not necessarily inconsistent with limitations to occasional overhead reaching. *Byers v. Colvin*, No. 4:14-CV-00164-CAN, 2017 WL 1251079, at *5-6 (E.D. Tex. March 10, 2010) (stating that it "refused to discern a conflict between the requirement of frequent reaching and a vocational expert's testimony that a person restricted in one extremity could perform the job"); *Rodriguez v. Colvin*, No. 3:14-CV-00032-RFC, 2015 WL 778852, at *4-5 (W.D. Tex. Feb. 23, 2015) (finding no conflict between a claimant's limitations on overhead reaching where the job has non-specific reaching and handling requirements); *Wleczyk v. Astrue*, No. 11-7-JJB-SCR, 2012 WL 3902436, at *5 (M.D. La. Aug. 6, 2012) (holding that it is "not facially apparent that being limited in the specific ability to reach overhead bilaterally is inconsistent with the general ability to reach"). Consequently, the Court concludes that there is no direct conflict between the VE's testimony and the SCO, and remand is not required.

Moreover, even assuming there was a conflict between the VE's testimony and the information contained in the DOT and/or the SCO, such a conflict is not a direct or obvious conflict; instead, it would be an implied or indirect conflict. "All kinds of implicit conflicts are possible and the categorical requirements listed in the DOT [or SCO] do not and cannot satisfactorily answer every such situation." *Adams v. Astrue*, No. CV-07-1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008). Again, "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT [or SCO], and

22

then present the conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Id.*; *see Carey*, 230 F.3d at 145-42.

In this case, Wooley was represented by an attorney at the hearing before the ALJ such attorney was specifically permitted by the ALJ to ask questions regarding the VE's testimony (Tr. 147-50). While such attorney did inquire about certain limitations and Wooley's ability to perform the jobs listed by the VE (Tr. 147-50), Wooley's attorney did not ask any questions regarding Wooley's ability to perform frequent reaching as required in such jobs if he was limited to occasional overhead reaching. Consequently, Wooley will not now be permitted to peruse the record in search of a conflict to present as reversible error and, instead, is found to have waived such argument. *See, e.g., Young v. U.S. Comm'r of Soc. Sec.*, No. CV08-0474, 2009 WL 2827945, at *13 (W.D. La. Sept. 1, 2009).

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections to the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendations to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above the specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error

or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **November 15, 2017** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendations. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED November 1, 2017.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

24